## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-cv-62034-ALTMAN/Strauss

**RICO RIVERA,**

     *Plaintiff,*

*v.*

**SERGEANT MARIN R,** *et al.,*

     *Defendants.*

_____/

## ORDER GRANTING MOTION TO DISMISS

On June 11, 2024, we adopted Magistrate Judge Strauss's Report and Recommendation and granted in part and denied in part the Defendants' first motion to dismiss. *See* Order Adopting Report and Recommendation [ECF No. 49] at 13–14 ("The Report and Recommendation [ECF No. 43] is ACCEPTED and ADOPTED in full."). We then instructed our Plaintiff, Rico Rivera, to file a Second Amended Complaint limited to: "(1) an equal-protection claim . . . , (2) a claim for supervisory liability . . . , and (3) [a] claim for 'Fourteenth Amendment: Due Process Disclosure of Exculpatory Evidence.'" *Id.* at 14. Rivera filed his Second Amended Complaint on July 12, 2024, *see* Second Amended Complaint [ECF No. 52], and the Defendants promptly moved to dismiss it on July 26, 2024, *see* Motion to Dismiss Second Amended Complaint ("Second MTD") [ECF No. 53].[1] After careful review, we'll **GRANT** the Defendant's Second MTD, **DISMISS** Count I of the Second Amended Complaint ***without prejudice***, and **DISMISS** Counts II and III ***with prejudice***.

---

[1] The Second MTD is ripe for adjudication. *See* Response to Defendants' Second Motion to Dismiss ("Response") [ECF No. 54]; Reply to Plaintiff's Response to Their Motion to Dismiss the Second Amended Complaint ("Reply") [ECF No. 55].

### THE FACTS

On February 5, 2023, Rivera called the Coconut Creek Police Department, "seeking intervention of a domestic violence incident after his wife continuously struck him . . . with a weapon in front of [a minor] unjustifiably." Second Amended Complaint ¶ 6. "Defendants Rodriguez, Kohlhorst, Garvey, Woolley, Blackwood, Brewster and Cross responded . . . to plaintiff['s] home" and were "accompanied by one supervisor, [Defendant] Sgt. Marin." *Id.* at 4. The Defendants initially spoke to Rivera's wife outside the home, where they were all "casually mingling[.]" *Ibid.* After talking to Rivera's wife, the Defendants "made their way up the steps screaming an order for [Rivera] to come out of the house with his hands where they could see them." *Ibid.* Once Rivera came out of the house, he "insisted" that Officers Blackwood and Rodriguez "view a recording of the incident that had just taken place," which showed "his wife committing battery with a weapon [a 'broom handle'] against [Rivera]" in front of their minor child. *Ibid.* Rivera also told the officers that there were "recordings from the home monitoring system," which showed other instances of "domestic violence by [Rivera's] wife[.]" *Ibid.*

When Officer Rodriguez saw the footage, he asked Rivera "what he would like to do about it." *Ibid.* Rivera "affirmatively stated that he would like to press charges" against his wife. *Ibid.* Officer Blackwood "immediately interjected and told [Rivera] he could not" arrest his wife, and the remaining officers formed "a circle around [Rivera]." *Id.* at 4–5. Blackwood "became frustrated because [Rivera] could not take the hint that any claim of domestic violence against him, no matter how credible, would not be entertained[.]" *Id.* at 7. Instead, the Defendants gave Rivera "an unlawful ultimatum" that he could either "get out of his home" or they would "fabricat[e] . . . evidence and circumstances" to show that Rivera was "the aggressor of violence." *Ibid.* Despite these threats, Rivera "refused to leave his residence[.]" *Id.* at 8.

The Defendants and Rivera's wife then "came up with [a] calculated scheme" to retaliate against Rivera, and Rivera's wife left the residence with their minor child. *See ibid.* ("[T]he plaintiff['s] wife [took] possession of [the minor child and] le[ft] the scene with her."). The Defendants filed a police report "tainted with numerous lies" and a "fraudulent report to child protective services stating that the plaintiff was mutually fighting his wife." *Id.* at 9. Five days after this police report was filed, Rivera's wife used these "fraudulent statements and evidence" to request a domestic-violence injunction against Rivera "to permanently remove [Rivera] from his child's life, from his home, from his business, from his property, [and] defame his character[.]" *Ibid.* Although the domestic-violence injunction was in effect "for a period of six months and [twenty-eight] days," *ibid.*, Rivera succeeded in having the injunction dismissed, *see ibid.* ("[Rivera's wife] was unable to fool a judge and the injunction against [Rivera] was finally dismissed.").

Two more Defendants, Criminal Investigator Fuentes and Chief of Police Arenal, "became involved in the incident approximately 45 days after the Plaintiff filed a complaint with the Coconut Creek Police Department internal affairs investigation unit." *Id.* at 12. Fuentes "gathered all of the evidence from [Rivera]" and closed the investigation "within 60 days." *Id.* at 12–13. Fuentes informed Rivera that he had "sustained the allegations from [Rivera's] complaint against Officer Blackwood" but found no wrongdoing by the other responding officers. *Id.* at 13. But Fuentes "did not provide any documentation to [Rivera]," and both Fuentes and Arenal "told [Rivera] what they thought he wanted to hear in order to shut him up[.]" *Ibid.* Rivera claims that the investigation was just "damage control"—designed to "protect the officers" and ratify "their deceptive and corrupt conduct that discriminated against [Rivera]." *Ibid.*

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,*

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

## ANALYSIS

The Defendants move to dismiss the Second Amended Complaint in full. *First*, they argue that Rivera fails to state a claim under the Equal Protection Clause because: (1) Rivera "was not deprived of a right guaranteed by the . . . Equal Protection Clause," Second MTD at 6; and (2) Rivera "fail[ed] to allege non-conclusory allegations of discrimination on the basis of gender," *id.* at 9. *Second*, they contend that Rivera cannot assert a supervisory-liability claim against Sergeant Marin "because Sergeant Marin did not personally participate in any unconstitutional conduct nor is there any casual connection between his actions and the alleged constitutional deprivation." *Id.* at 13. *Third*, they say that the claim against Defendants Fuentes and Arenal for "failure to disclose exculpatory evidence" fails "because the count does not assert any viable constitutional violation." *Id.* at 15. We'll address each argument in turn.

## I.        Equal Protection Clause (Count I)

Rivera's first count "is against all defendants" in their individual and official capacities.[2] Second Amended Complaint at 4. Here, Rivera alleges that the Defendants' discriminatory conduct was caused by an "official custom" that encourages officers to discriminate against men in domestic-violence investigations. *See, e.g.*, *id.* at 5 ("[Males] do not have the right to be free from [ ] violence and abuse the same as women . . . and that men are not provided the same protective measures and instruments as other victims of violence[.]"); *ibid.* ("The defendants['] discrimination was based on a sex stereotype where natural born males, men, and those identifying as such . . . cannot be victims of domestic violence[.]"); *id.* at 8 (alleging that the Defendants "intentionally harm men/males who recognize and complain when domestic violence happens to them").

The Defendants counter that Rivera's Equal Protection claim isn't plausible for several reasons. Starting with Rivera's individual-capacity claims, the Defendants maintain that Rivera "was not deprived of a right guaranteed" by the Fourteenth Amendment, Second MTD at 7, and that "Rivera fails to allege nonconclusory allegations of discrimination on the basis of gender," *id.* at 9. And Rivera cannot sue the officers in their *official* capacities (the Defendants insist) because he "fails to allege any facts actually establishing a policy, any facts showing any such policy was an 'official policy' . . . or establishing that any such policy was the 'moving force' that 'actually caused' a constitutional injury." *Id.* at 13. We agree that Rivera's *official*-capacity claim fails and that any amendment of that claim would be futile. The *individual*-capacity claim, however, is a harder call. Ultimately, though, while we think there may be a cognizable claim in there somewhere, we agree with

---

[2] Under § 1983, a plaintiff can sue a state actor in his individual capacity, his official capacity, or both. An individual-capacity suit "seek[s] to impose personal liability upon a government official for actions he takes under color of state law," whereas an official-capacity claim is, "in all respects other than name, [a] suit against the [public entity the official works for]." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

the Defendants that Rivera hasn't done enough to plead that claim sufficiently. As to the individual-capacity claim only, therefore, we'll grant Rivera leave to try one more time.

## A.    The Individual-Capacity Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV § 1. Since the Constitution "requires government entities to treat similarly situated people alike," *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006), a plaintiff can assert a viable equal-protection claim by alleging that he was the victim of "[u]nequal administration of facially neutral legislation," *E&T Realty v. Strickland*, 830 F.2d 1107, 1113 (11th Cir. 1987). "Unequal application of facially neutral rules can result from either 'misapplication (i.e., departure from or distortion of the law) or selective enforcement (i.e., correct enforcement in only a fraction of cases).'" *Red Door Asian Bistro v. City of Ft. Lauderdale*, 2023 WL 5606088, at *7 (11th Cir. Aug. 30, 2023) (quoting *E&T Realty*, 830 F.2d at 1113). Although the standards for bringing a "selective enforcement" claim versus a "misapplication" claim are somewhat different, *any* equal protection claim will fail unless the plaintiff sufficiently alleges "that [the] defendants acted with discriminatory intent." *E&T Realty*, 830 F.2d at 1113.

For instance, a plaintiff bringing a "selective enforcement" claim "must allege that through state action, similarly situated persons have been treated disparately, and put forth evidence that [the defendant's] actions were motivated by [gender]." *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004) (cleaned up); *see also Giraldo v. City of Hollywood Fla.*, 142 F. Supp. 3d 1292, 1301 (S.D. Fla. 2015) (Dimitrouleas, J.) ("To state a claim under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff must allege that: (1) he is similarly situated with other persons who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally

protected interest such as race or gender.").[3] By contrast, a "misapplication" equal protection claim only requires the plaintiff to show "(1) a discriminatory motive; and (2) a discriminatory effect." *Red Door*, 2023 WL 5606088, at *8 (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Rivera has advanced a "misapplication" claim here. In Rivera's view, after all, the Defendants believe "that men, and natural born males, do not have the right to be free from violence and abuse the same as women"—and so, Rivera says, their refusal to charge Rivera's wife as the aggressor in a domestic-violence case, even after reviewing evidence of her guilt, "was based on a sex stereotype where [males] . . . cannot be victims of domestic violence or that males/men are not subjected to equal treatment as other victims of domestic violence[.]" Second Amended Complaint at 5.[4] "In other words, [Rivera] allege[s] that [the Defendants] did not correctly enforce the law but rather refused to correctly apply it because of anti-[male] animus." *Red Door*, 2023 WL 5606088, at *8; *see also, e.g.*, *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (finding existence of misapplication claim where the plaintiffs "allege[d] and establish[ed] that the defendants discriminatorily refused to provide police protection because the plaintiffs are Native American").

But there are several glaring deficiencies in Rivera's complaint. *First*, the SAC plainly fails to comply with Rule 10 of the Federal Rules of Civil Procedure, which required Rivera to "state [his]

---

[3] In addition to a "traditional equal protection claim," a plaintiff can also bring a "class of one" claim when he "does not allege discrimination against a protected class, but rather asserts that the plaintiff 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Leib v. Hillsborough Cnty. Pub. Transit Comm'n*, 558 F.3d 1301, 1306–07 (11th Cir. 2009) (quoting *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1032 n.1 (11th Cir. 2008)). Magistrate Judge Strauss has already found that Rivera wasn't asserting a "class of one" equal-protection claim because he specifically (and emphatically) alleged that "Defendants discriminated against him because he is male[.]" R&R at 5. Since Rivera continues to allege that "[t]he defendants['] discrimination was based on a sex stereotype" against men, Second Amended Complaint at 5, we agree with Magistrate Judge Strauss that Rivera isn't advancing a "class of one" claim.
[4] Since Rivera isn't asserting a selective-enforcement claim, we reject the Defendants' contention that Rivera must "show disparate treatment compared to a similarly situated party." Motion at 9 (quoting *Young Apartments*, 529 F.3d at 1045–46).

claims or defenses in numbered paragraphs, *each limited as far as practicable to a single set of circumstances.*"
FED. R. CIV. P. 10(b). The allegations underlying Count I are instead presented in a rambling twelve-
page manifesto laden with conclusory and speculative statements—amounting to little more than a
bloated (and, at times, incoherent) play-by-play of what Rivera perceived as ill-treatment at the hands
of the Defendants. *See, e.g.*, Second Amended Complaint at 5 ("[The Defendants] refused to even look
at the video [of the domestic violence], and that is because regardless of what the video showed, the
defendants do not recognize the fact that [men] can also be victims of violence."); *id.* at 6 ("All of the
defendants deliberately sided with [Rivera's wife] because she is a woman."); *id.* at 7–8 ("Not only do
the defendants fail to recognize domestic violence when it happens to a [man] . . . they intentionally
harm [men] who recognize and complain when domestic violence happens to them, as they have done
in this case . . . and it is likely that all males/men would be whom disagreed and refused to submit."
(errors in original)). This is all mere speculation. Rivera never alleges that any of these officers told
him they were prejudiced against men in this way, and his suggestion that "it is likely [ ] all males/men"
would be discriminated against is pure conjecture.

At any rate, as we've said, the Second Amended Complaint "consist[s] of a lengthy series of
unnumbered paragraphs containing what amounts to a personal narrative suggesting, but not clearly
and simply stating, a myriad of potential claims." *Giles v. Wal-Mart Distrib. Ctr.*, 359 F. App'x 91, 93
(11th Cir. 2009); *see also GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1368 (11th Cir. 1998)
("GJR's allegations of discriminatory intent are deficient in much the same way, using many broad
pejorative words to describe the defendants' intentions without giving any specifics.").[5] This is all
reason enough to dismiss the Second Amended Complaint again.

---

[5] And Judge Strauss long ago put Rivera on notice that Count I was insufficient because it relied only
on conclusory assertions. Although we didn't dismiss Count I the first time around—because the
Defendants "fail[ed] to address Plaintiff's allegations that Defendants discriminated against him
because he is male," Order Adopting R&R at 3 n.2 (quoting R&R at 5)—Magistrate Judge Strauss

But here's the thing: Even if Rivera *had* sufficiently alleged that the Defendants acted with discriminatory intent, his claim would still fail because he hasn't shown that he was harmed by the Defendants' (alleged) gender-based animus. *See Red Door Asian Bistro v. Gonzalez*, 2024 WL 4056710, at *9 (S.D. Fla. Sept. 5, 2024) (Altman, J.) ("The 'discriminatory effects requirement encompasses both inequality of opportunity and a causation element.' To prevail on their equal-protection claim, then, the Plaintiffs 'must establish an adequate causal link between the alleged harm and the alleged unlawful conduct.'" (first quoting *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1345 n.20 (11th Cir. 2000); and then quoting *Dixon v. Burke County*, 303 F.3d 1271, 1275 (11th Cir. 2002)); *see also, e.g.*, *Coleman v. Miller*, 885 F. Supp. 1561, 1569 (N.D. Ga. 1995) (Evans, J.) ("The court now turns to evaluation of the evidence as to the second element of Plaintiff's equal protection claim— discriminatory effect. Even though the court accepts Plaintiff's assertion that the [state's use of the Confederate battle flag] has a negative, devaluing effect on him, the evidence fails to show a sufficiently concrete, present-day discriminatory impact . . . to sustain Plaintiff's burden of proof on this element."). Rivera alleges that the Defendants intentionally disobeyed the law (for discriminatory reasons) during their encounter with him and that this discrimination harmed him. *See* Second Amended Complaint at 5 ("All of the defendants that were on scene exercised their discretion and chose not to punish the person who violated the law, because the one who violated the law was female and the male was the victim."). But (for three reasons) we agree with the Defendants that "Rivera was not deprived of any protection or right" guaranteed by the Constitution (even if the Defendants had acted with discriminatory intent).

---

explicitly warned Rivera that Count I was rife with conclusory allegations and, therefore, likely failed to state a claim. *See* R&R at 13 n.6 ("Plaintiff does allege in Count 1 that Defendants discriminated against him because he is male. However, he includes no such allegations in Count 5 of the Amended Complaint. Regardless, even if he had included the same allegations as in Count 1, such conclusory allegations alone would not plausibly allege the requisite class-based discriminatory animus.").

*One*, Rivera cannot use his equal-protection claim to circumvent the well-settled rule that "[a] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *accord Otero v. U.S. Att'y Gen.*, 832 F.2d 141, 141 (11th Cir. 1987) (same).[6] "[The] Court has long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *United States v. Texas*, 599 U.S. 670, 674 (2023) (quoting *Linda R.S.*, 410 U.S. at 619). The Defendants' decision not to prosecute Rivera's wife thus didn't violate *his* rights at all. Indeed, the Eleventh Circuit has held that the victim of a crime lacks standing to challenge a police department's failure to arrest (or charge) the perpetrator of that crime. *See Garcia v. Miami Beach Police Dep't*, 336 F. App'x 858, 859 (11th Cir. 2009) ("In the instant case, the Miami Beach Police Department Internal Affairs Division

---

[6]   Admittedly, this rule makes little sense in the specific context at issue here—*i.e.*, where a plaintiff claims that, as to him, the police intentionally refused to enforce the law equally *because of* his sex. But that was precisely the issue the Supreme Court confronted in *Linda R.S.*, where a Texas statute threatened *legitimate* fathers with criminal prosecution (and fines) for their failure to pay child support—but, notably, excluded *illegitimate* fathers from the law's requirements. The plaintiff in that case brought an equal-protection challenge to the Texas law, asserting that the law discriminated against her minor child's illegitimacy (a protected class). The Supreme Court disagreed, holding that, "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." 410 U.S. at 619. The Court recognized that the "Appellant does have an interest in the support of her child. But given the special status of criminal prosecutions in our system, we hold that appellant has made an insufficient showing of a direct nexus between the vindication of her interest and the enforcement of the State's criminal laws." *Ibid.*

In dissent, Justice White (joined by Justice Douglas) voiced the same concern we express here: "If a State were to pass a law that made only the murder of a white person a crime," Justice White hypothesized, "I would think that Negroes as a class would have sufficient interest to seek a declaration that that law invidiously discriminated against them. Appellant and her class have no less interest in challenging their exclusion from what their own State perceives as being the beneficial protections that flow from the existence and enforcement of a criminal child-support law." *Id.* at 621 (White, J., dissenting). But that view was rejected by the majority, and it's our job to apply the holdings (not the dissents) of the Supreme Court of the United States. As the Fifth Circuit has written (interpreting *Linda R.S.*): "Under this established principle of standing, each of us has a legal interest in how we are treated by law enforcement—but not a legally cognizable interest in how others are treated by law enforcement. So people accused of a crime have an obvious interest in being treated fairly by prosecutors. And victims of crime have a strong interest in their own physical safety and protection. But victims do not have standing based on whether other people—including their perpetrators—are investigated or prosecuted." *Lefebure v. D'Aquilla*, 15 F.4th 650, 660 (5th Cir. 2021).

acted in a prosecutorial capacity by investigating the claim and choosing not to bring charges or investigate further. Thus, Garcia lacks standing to assert a claim against the police department or its officers for damages for failing to prosecute her unidentified attackers." (citing *Smith v. Shook*, 237 F.3d 1322, 1324 (11th Cir. 2001))); *see also Lefebure v. D'Aquilla*, 15 F.4th 650, 654 (5th Cir. 2021) ("But longstanding Supreme Court precedent confirms that a crime victim lacks standing to sue a prosecutor for failing to investigate or indict her perpetrator, due to lack of causation and redressability." (citing *Linda R.S.*, 410 U.S. at 618)); *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 901 (7th Cir. 2012) (en banc) (Easterbrook, C.J., concurring) ("Del Marcelle [the victim] is not entitled to an order requiring arrest or prosecution of the bikers, or to damages because of public officials' decision not to do so.").

*Two*, the Defendants' alleged threats to arrest Rivera and to falsify evidence against him didn't violate his constitutional rights, either. According to Rivera, the officers threatened that, if he didn't leave his home, they "would fabricate evidence and make it a point that [Rivera] was the primary aggressor of violence when [Rivera] was not even an aggressor at all." Second Amended Complaint at 7 (cleaned up). To the extent Rivera is contending that the Defendants' "unlawful ultimatum" was illegal, *ibid.*, police threats and verbal abuse *alone* do not violate the Constitution, *see Unuvar v. City Key West, Fla.*, 394 F. App'x 628, 630 (11th Cir. 2010) ("The discriminatory statements attributed to Young and Addleman (even if repugnant and offensive), without more, state no constitutional violation cognizable under Section 1983." (first citing *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000); and then citing *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991))); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008) ("Hernandez's allegations of verbal abuse and threats by the prison officers did not state a claim because the defendants never carried out these threats and verbal abuse alone is insufficient to state a constitutional claim." (citing *Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989))).

Nor does the Defendants' (alleged) decision to file a false police report save Rivera's claim. Simply put, the filing of a false police report—especially one that doesn't result in an arrest, prosecution, or conviction—doesn't violate the Constitution. *See Jones v. Jordan*, 2021 WL 4465194, at *2 (M.D. Fla. Aug. 16, 2021) (Berger, J.) ("Plaintiff alleges that Gordon filed a false arrest affidavit. However, 'the filing of a false police report is not itself a constitutional violation.'" (quoting *Jarrett v. Township of Bensalem*, 312 F. App'x 505, 507 (3d Cir. 2009))); *Abella v. Simon*, 831 F. Supp. 2d 1316, 1341 (S.D. Fla. 2011) (Altonaga, J.) ("Courts have held that there is no constitutional right to a correct police report." (citing *Landrigan v. City of Warwick*, 628 F.2d 736, 745 (1st Cir. 1980))), *rev'd on other grounds by* 482 F. App'x 522 (11th Cir. 2012).

*Three*, Rivera insists that the Defendants gave his wife "confidence and encouragement" to seek (and obtain) a fraudulent domestic-violence injunction against him. *See* Second Amended Complaint at 11 ("[The Plaintiff] has his entire life destroyed and stripped away from him by [his] abuser, and this extra help from the defendants to give her the confidence to make it all possible." (errors in original)). Two problems with this. *First*, Rivera is just speculating when he alleges that the officers' false police report gave his wife the "confidence" she needed to seek an injunction. And a complaint cannot survive based on speculation alone. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right of relief above the speculative level."). *Second*, Rivera already advanced this very same claim in Count IV of his Amended Complaint, and Magistrate Judge Strauss (whose reasoning we adopted in full) already dismissed that count. *See* R&R at 10–11 ("In arguing that a deprivation of liberty occurred, Plaintiff asserts that the liberty deprivation is the nearly seven months that Plaintiff was placed under a domestic violence injunction. However, Plaintiff acknowledges in his response that the police report was not used against him in court; he contends that the report has not been used in family court because his wife has not had a chance to do so yet. Moreover, even if the report were to be used against Plaintiff in family court (which Plaintiff plainly acknowledges has not

occurred), Plaintiff fails to explain how such use in family court—as opposed to a criminal prosecution—would deprive Plaintiff of liberty." (citing *Lee v. City of Phila.*, 627 F. App'x 175, 176–77 (3d Cir. 2015))); *see also* Order Adopting R&R at 13 ("The [R&R] is **ACCEPTED** and **ADOPTED** in full.").

Rivera (it's true) now mentions, for the first time, that the Defendants *also* "constructed a report to child protective services," and that this report was "used for their intended purpose[.]" Second Amended Complaint at 12. But Rivera doesn't explain what this means. He doesn't, in other words, tell us *which* of the Defendants prepared this report, *what* the report said, or even *how* the report's contents injured him, so we aren't sure how this report is relevant to his discrimination claim. *See Iqbal*, 556 U.S. at 678 ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (cleaned up)). Rivera can make all this clearer in his third amended complaint—should he choose to file one. In the meantime, Rivera fails to state an equal-protection claim against the Defendants in their individual capacities.

### B.  Official-Capacity Claim

"[A] suit against a governmental official in his official capacity is deemed a suit against the entity that he represents." *Brown v. Neuman*, 188 F.3d 1289, 1290 (11th Cir. 1999) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). This means that a suit "against state officials in their official capacity . . . should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). A plaintiff who wants to maintain an official-capacity action must allege that the unconstitutional acts were caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the state's] officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). A state entity can also be liable for creating an unconstitutional custom, which the Supreme Court has defined as

"practices so persistent and widespread as to practically have the force of the law." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). To prevail on an official-capacity § 1983 claim, then, "a plaintiff must prove (1) something that qualifies as an official local-government policy (2) was the 'moving force' that 'actually caused' (3) the plaintiffs constitutional injury." *Sosa v. Martin Cnty., Fla.*, 2023 WL 1776253, at *7 (11th Cir. Feb. 6, 2023) (citing *Connick*, 563 U.S. at 59 n.5).

Rivera seems to concede that the Coconut Creek Police Department doesn't have a written policy of discriminating against men. *See* Second Amended Complaint at 9–10 ("[T]here is already a universal unspoken stigma [i]n relation to men and domestic violence."). So, his official-capacity claim will fail unless he can show that an unofficial custom caused his (supposed) injury. And Rivera *does* say that the Defendants "have adopted an official custom . . . that men, and natural born males, do not have the right to be free from [ ] violence and abuse the same as women[.]" Second Amended Complaint at 5. Even so, he fails to allege that this custom is so widespread as to "have the force of law" within the Department. *Connick*, 563 U.S. at 60. Instead, Rivera offers *only* his own interaction with the officers on February 5, 2023, as proof of this unconstitutional custom. *See generally* Second Amended Complaint at 4–16. Unfortunately for Rivera, "random acts or isolated incidents are insufficient to establish a custom or policy." *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986); *see also Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability . . . . A pattern of similar constitutional violations is ordinarily necessary. A single incident would not be so pervasive as to be a custom because a custom must be such a longstanding and widespread practice that it is deemed authorized by policymaking officials[.]" (cleaned up)); *Sullenberger v. City of Coral Gables*, 2024 WL 262530, at *15 (S.D. Fla. Jan. 24, 2024) (Altman, J.) ("And it's well-settled that a plaintiff cannot establish an illegal policy or custom based only on the unconstitutional conduct the government officials directed at him."). Since Rivera's only proof that the Coconut Creek Police Department

follows an unconstitutional custom of discriminating against men is the Department's failure to arrest his wife, we must dismiss his official-capacity claim[7] against the Defendants.[8]

*     *     *

For all these reasons, we **DISMISS** Count I of the Second Amended Complaint.[9]

---

[7] Insofar as Rivera asserts official-capacity claims against the Defendants in Counts II and III, those claims fail for the same reason—*i.e.*, because Rivera failed to allege that an unconstitutional custom was so widespread as to "have the force of law" within the Department. *Connick*, 563 U.S. at 60.

[8] In his Response, Rivera urges us to disregard the arguments the Defendants advanced against Count I in their Second MTD because the Defendants "had the opportunity to raise [these arguments] in their original 12(b)(6) motion" and can only raise "new Rule 12(b) defense[s] against an amended complaint where the defendant challenges 'new matter.'" Response at 2. But that's not right. It's true that "[a] party waives any defense listed in Rule 12(b)(2)–(5)" when that defense is "omitt[ed] from [an earlier] motion[.]" FED. R. CIV. P. 12(h)(1)(A) (emphasis added). But, as the text of this Rule makes plain, "Rule 12(b)(6) . . . defenses are not automatically waived if not asserted in a party's first responsive pleading[.]" *Pilteq, Inc. v. Mostafa*, 2024 WL 3070171, at *9 (S.D. Fla. June 20, 2024) (Elfenbein, Mag. J.), *report and recommendation adopted*, 2024 WL 3617473 (S.D. Fla. Aug. 1, 2024) (Lenard, J.); *see also Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("Rule 12(g)(2) does not prohibit a new Rule 12(b)(6) argument from being raised in a successive motion. Stated differently, Rule 12(h)(2) specifically excepts failure-to-state-a-claim defenses from the Rule 12(g) consolidation requirement."). Since the Defendants have moved to dismiss Count I under Rule 12(b)(6), their Second MTD *can* advance arguments they hadn't advanced before.

[9] Rivera now says that the Defendants' actions also violated "the Omnibus Crime Control and Safe Streets Act," the Violence Against Women Act, and "Title VI of the Civil Rights Act of 1964." Response at 6–7. But none of these statutes apply here. Neither the Violence Against Women Act nor Title VI gives Rivera a private right of action to sue the Defendants. *See Alexander v. Sandoval*, 532 U.S. 275, 293 (2001) ("Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action . . . . We therefore hold that no such right of action exists."); *United States v. Morrison*, 529 U.S. 598, 627 (2000) ("But Congress' effort in [the Violence Against Women Act] to provide a federal civil remedy can be sustained neither under the Commerce Clause nor under § 5 of the Fourteenth Amendment."). And the Omnibus Crime Control and Safe Streets Act's anti-discrimination provision doesn't apply here because its scope is limited to "programs or activit[ies] funded in whole or in part with funds made available under this chapter." 34 U.S.C. § 10228(c)(1); *see also O.L. v. City of El Monte*, 2020 WL 4434949, at *16 (C.D. Cal. June 26, 2020) ("[The Omnibus Crime Control and Safe Streets Act] *prohibits discrimination in any program or activity funded by this Act* based on race, color, religion, national origin, or sex. In order to exhaust administrative remedies under 34 U.S.C. § 10228, an administrative complaint must be filed with the Office of Justice Programs or any other administrative enforcement agency." (emphasis added & cleaned up)). And Rivera never alleges that the Coconut Creek Police Department is funded by the Omnibus Crime Control and Safe Streets Act—nor does he suggest that he was discriminated against pursuant to any program or activity funded by that Act. *See generally* Second Amended Complaint.

## II.    Supervisory Liability (Count II)

The Defendants next argue that the Plaintiff failed to state a supervisory-liability claim against Sergeant Marin because he "did not personally participate in any unconstitutional conduct nor is there any casual connection between his actions and the alleged deprivation." Second MTD at 13. They also contend that Count II repeats many of the same factual allegations and arguments we deemed insufficient in our prior order. *See id.* at 13–14 ("Rivera complains again that Sgt. Marin was present when Officer Blackwood gave Rivera the 'ultimatum' to remove himself from the home or be subjected to 'being framed for domestic violence.' . . . This is the exact same series of facts that this Court deemed insufficient to state a claim." (first quoting Second Amended Complaint at 16; and then citing Order Adopting R&R at 7–8)). Rivera doesn't appear to contest any of the Defendants' arguments as to Count II. *See generally* Response; *see also* Reply at 5–6 ("In his Response, Plaintiff does not appear to have made an argument in opposition."). We therefore agree that Count II must be dismissed.

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. Instead, supervisory liability under 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a casual connection between the action of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (cleaned up). The Eleventh Circuit has found that a "necessary causal connection" between a supervisor and his subordinate's acts can be established in one of three ways: (1) where "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) when "a supervisor's custom or policy results in deliberate indifference to constitutional rights or . . . facts support an inference that the supervisor directed his subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop

16

them from doing so"; or (3) when the supervisor fails "to adequately train [his or her] officers[.]" *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1355 (11th Cir. 2022) (cleaned up). Rivera never identifies a history of widespread abuse (first prong), and he never alleges that Sergeant Marin failed to adequately train the officers (third prong).

Instead, Rivera alleges that Sergeant Marin should be held liable because he personally participated in the events of February 5, 2023. *See* Second Amended Complaint at 16–17 (alleging that Marin "was present and directly observed his subordinates['] misconduct"—*viz.*, the threat to "frame[ ] [Rivera] for domestic violence" and the preparation of a "fabricated" police report). But that's exactly what he alleged in Count I, and Rivera named Marin as a Defendant in that count. *See id.* at 4. Since Rivera's "supervisory-liability claim[ ] against [Marin is] duplicative of the allegations he[ ] advanced in Count [I]," we won't "consider the same allegations twice[.]" *Burgess v. Palm Beach County*, 2023 WL 7410056, at *2 (S.D. Fla. Nov. 9, 2023) (Altman, J.) (citing *Manning v. Carnival Corp.*, 2012 WL 3962997, at *2 (S.D. Fla. Sept. 11, 2012) (Altonaga, J.)); *see also, e.g.*, *Spradlin v. Toby*, 2024 WL 3881483, at *8 (M.D. Ga. Aug. 19, 2024) (Treadwell, J.) ("Spradlin's amended complaint also alleges a 'supervisory liability' claim . . . . To the extent Count Seven relies on Roberts' individual conduct, it is duplicative of Counts One through Four. Otherwise, [the] amended complaint does not specify any supervisory acts that would be more appropriately analyzed under the supervisory liability framework.").

We, in short, **DISMISS** Count II of the Second Amended Complaint.

### III.    Failure to Disclose Exculpatory Evidence (Count III)

Rivera alleges in Count III that, while Rivera was contesting his wife's domestic-violence injunction in state court, Defendants Fuentes and Arenal failed to disclose evidence that Rivera "[was] actually labeled as the victim[ ] of domestic violence[.]" Second Amended Complaint at 20. Rivera says that, although Defendant Fuentes told him "that he was going to remove [Rivera's] wife['s] name . . . as a listed victim of domestic violence" in a supplemental police report, the Defendants "never

provided any signed document or proof about the investigation"—as a result of which Rivera was temporarily "placed under a domestic injunction wrongly." *Id* at 18. Without this corrected police report, Rivera says, he couldn't prove to the state judge that he was "exonerated for what he was wrongly accused" of. *Id.* at 19. Still, despite the Defendants' alleged suppression of this exculpatory evidence, Rivera was able to get the injunction lifted. *See ibid.* ("But unfortunately for their plans, the judge was . . . not fooled by [Rivera's] wife and her team.").

The Defendants ask us to dismiss Count III for three reasons. *First*, they contend that Rivera "fails to aver facts to support the conclusory allegation that the report was 'suppressed' by anyone in bad faith and with the intent to deprive Rivera of a fair trial." Second MTD at 16. *Second*, they say that the report wouldn't have been favorable to Rivera because: (1) it was inadmissible under Florida law and "would not constitute evidence of the altercation on February 5, 2023, between Rivera and his wife"; and (2) "the incident report still concludes that the officers were unable to determine the primary aggressor." *Id.* at 18. *Third*, they argue that Rivera wasn't prejudiced by the Defendants' alleged failure to disclose the report since "Rivera . . . was successful at trial." *Ibid.*

The government "violates due process" when it suppresses exculpatory evidence "where the evidence is material either to guilt or to punishment[.]" *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation": (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the evidence was "suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the [accused], the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *accord Strickler*, 527 U.S. at 280.

For starters, Rivera hasn't shown that he was constitutionally entitled to exculpatory evidence for a domestic-violence-injunction hearing. A "petition for a domestic violence injunction is a civil cause of action" under Florida law. *Berrien v. State*, 189 So. 3d 285, 287 (Fla. 1st DCA 2016) (citing FLA. STAT. § 741.30(1)). Although the Eleventh Circuit hasn't opined on this issue, federal courts around the country have uniformly held that *Brady* usually doesn't apply in civil proceedings. *See Fox ex rel. Fox v. Elk Run Coal Co., Inc.*, 739 F.3d 131, 138–39 (4th Cir. 2014) ("But courts have only in rare instances found *Brady* applicable in civil proceedings, mainly in those unusual cases where the potential consequences 'equal or exceed those of most criminal convictions.'" (quoting *Demjanjuk v. Petrovsky*, 10 F.3d 338, 354 (6th Cir. 1993))); *Ceasar v. City of Eunice*, 642 F. App'x 387, 389 (5th Cir. 2016) ("*Brady* does not apply in civil proceedings[.]"); *Brodie v. Dep't of Health & Human Servs.*, 951 F. Supp. 2d 108, 118 (D.D.C. 2013) ("*Brady* does not apply in civil cases except in rare situations, such as when a person's liberty is at stake.").

Indeed, we've found only three examples of situations in which a federal court has applied *Brady* to a civil proceeding: (1) a "denaturalization and extradition case [where a defendant was set] to face trial on a charge carrying the death penalty," *Brodie*, 951 F. Supp. 2d at 118–19 (citing *Demjanjuk*, 10 F.3d at 353); (2) "civil commitment hearings under 18 U.S.C. § 4248," *id.* at 119 (citing *United States v. Edwards*, 777 F. Supp. 2d 985, 994 (E.D.N.C. 2011)); and (3) a proceeding before the Equal Employment Opportunity Commission ("EEOC"), in which the government alleged that an employer "committed discriminatory employment practices," *ibid.* (citing *EEOC v. Los Alamos Constr., Inc.*, 382 F. Supp. 1373, 1374 (D.N.M. 1974)). The District of New Mexico's decision in *Los Alamos* is the only example we could find of this third exception—*i.e.*, *Brady*'s application to EEOC proceedings—and even that case appears to have been limited to its unique set of facts. As one district court has explained, "the judge [in *Los Alamos*] described the employment discrimination complaint as 'a phantom legal conclusion' and a 'skeleton complaint,' which gave the defendant little or no facts on

which to prepare a defense." *United States ex rel. (Redacted) v. (Redacted)*, 209 F.R.D. 475, 482 (D. Utah 2001) (quoting *Los Alamos*, 382 F. Supp. at 1374). And "many courts" since *Los Alamos* "have . . . [found] that *Brady* does not apply in the context of administrative hearings." *Brodie*, 951 F. Supp. 2d at 119 (cleaned up); *see also, e.g.*, *Tandon v. Comm'r of Internal Revenue*, 210 F.3d 372, 2000 WL 331926, at *1 (6th Cir. 2000) (Table) ("This Circuit has never applied the *Brady* rule to a civil proceeding for determining the amount of one's tax liability."); *N.L.R.B. v. Nueva Engineering, Inc.*, 761 F.2d 961, 969 (4th Cir. 1985) ("An action for violations of the National Labor Relations Act is civil in nature, does not involve potential incarceration and violation of the Act does not carry with it the stigma of a criminal conviction."); *Mister Discount Stockbrokers v. S.E.C.*, 768 F.2d 875, 878 (7th Cir. 1985) ("*Brady v. Maryland,* however, involved a criminal prosecution, while the petition currently before the court involves the review of an administrative agency proceeding and not a violation of the criminal law.").

In the end, although Rivera has shown that a domestic-violence injunction can have serious ramifications—such as losing custody of a minor child, *see* Second Amended Complaint at 20 ("Children can be taken away from men in family court when men commit domestic violence against a woman[.]")—these consequences don't "equal or exceed those of most criminal convictions," *Demjanjuk*, 10 F.3d at 354; *see also Clark v. Upton*, 2009 WL 1460815, at *18 (E.D. Cal. May 26, 2009) ("It is unclear whether *Brady v. Maryland* has any application to civil child dependency proceedings."). We therefore agree that Rivera had no constitutional right to the disclosure of exculpatory evidence at his domestic-violence-injunction hearing.

But here's the thing: Even assuming that *Brady* applies in domestic-violence-injunction hearings, Rivera's claim still fails because he wasn't prejudiced by the alleged suppression. It's undisputed that Rivera "was successful in exonerating himself" at his domestic-violence hearing— even without the supplemental report—because the state court dissolved the domestic-violence injunction against him. *See* Second Amended Complaint at 14–15 ("And though [Rivera] was

successful in exonerating himself, there has been no justice only that the domestic injunction against the plaintiff [ ] was dismissed."). Since Rivera prevailed without the report, the admission of the report at the hearing wouldn't have changed the outcome of the case. *See Strickler*, 527 U.S. at 296 ("Notwithstanding the obvious significance of Stoltzfus' testimony, petitioner has not convinced us that there is a reasonable probability that the jury would have returned a different verdict if her testimony had been either severely impeached or excluded entirely."); *see also, e.g.*, *Thompson v. Jones*, 2017 WL 11461015, at *19 (S.D. Fla. Mar. 29, 2017) (White, Mag. J.) ("Even if, as alleged, the prosecution failed to disclose any purported *Brady* evidence as suggested, the suppression did not result in any prejudice to the defense. As will be recalled, the jury acquitted petitioner on the charge of sale of cannabis[.]"), *report and recommendation adopted*, 2017 WL 11460995 (S.D. Fla. Dec. 7, 2017) (Lenard, J.).

Still resisting, Rivera insists that he was prejudiced because, had the report been released earlier, the injunction would have been dissolved sooner. *See* Response at 13 ("[It] took a total of 6 months and 28 days [to dismiss the injunction], and it could have been substantially shortened, 'mitigated,' but the[ ] defendants waited."). But evidence is material only if, "had the evidence been disclosed to the defense, *the result of the proceeding would have been different*." *Strickler*, 527 U.S. at 280 (emphasis added) (quoting *Bagley*, 473 U.S. at 682). Rivera's own allegations confirm that the state court imposed the injunction *before* Defendants Fuentes and Arenal prepared the purportedly exculpatory supplemental report. *See* Second Amended Complaint at 20 ("On 06/07/2023 [L]ieutenant Fuentes proceed[ed] to supplement the report . . . [to show] the only two people listed as victims were [Rivera] and [his minor child].""); *see also id.* at 14 (alleging that Rivera was "serve[d] with the injunction" on February 6, 2023). Obviously, a June 7, 2023, report could have had no effect on a judicial decision that had been made four months earlier. And Rivera never says that, had he received the report in June 2023, he would have had some (earlier) opportunity to have the injunction expunged

*before* the final injunction hearing on August 30, 2023. *See generally* Second Amended Complaint. In short, Rivera cannot show that the Defendants' (alleged) failure to disclose the supplemental report prejudiced him in any judicial proceeding.

Since the Defendants' alleged failure to timely disclose their supplemental report didn't affect Rivera's constitutional rights, we **DISMISS** Count III.

### IV.     Leave to Amend

Normally, a dismissal under Rule 12(b)(6) is "on the merits and with prejudice." *White v. Lemma*, 947 F.3d 1373, 1377 (11th Cir. 2020). But, in the Eleventh Circuit, "a *pro se* plaintiff must be given *at least one chance* to amend the complaint before the district court dismisses the action with prejudice—at least, that is, where a more carefully drafted complaint might state a claim." *Silberman v. Miami-Dade Transit*, 927 F.3d 1123, 1132 (11th Cir. 2019) (emphasis added & cleaned up). Despite the relative leniency we afford *pro se* litigants, we find that dismissal *with prejudice* is appropriate here as to Counts II and III.

*First*, as to Count II, we've already given Rivera one opportunity to amend his supervisory-liability count. *See* Order Adopting R&R at 9 ("[W]hile we agree with Judge Strauss that the Amended Complaint currently fails to state a claim for supervisory liability against the Defendant Sergeant Marin, we'll allow the Plaintiff to amend Count 3[.]"). "Since we've already granted [Rivera] leave to amend this claim once before . . . we needn't give him any more chances[.]" *Sullenberger*, 2024 WL 262530, at *13. *Second*, as to Count III, we find that any additional amendments would be futile since *Brady* doesn't apply in civil proceedings and because Rivera cannot show that he was prejudiced by the (alleged) suppression of the supplemental report. *See Thevenin v. Bradshaw*, 2024 WL 2801489, at *4 (S.D. Fla. May 31, 2024) (Ruiz, J.) ("[T]he court is not required to grant [a *pro se* plaintiff the opportunity to amend] 'where amendment would be futile.'" (quoting *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001))).

But we come out the other way on Count I. True, Magistrate Judge Strauss has already placed Rivera on notice about Count I's glaring deficiencies. *See ante*, at note 5. Still, this is the first time we told Rivera about the more substantive flaws with his equal-protection claim—specifically Rivera's failure to sufficiently plead discriminatory intent and discriminatory effect (beyond some conclusory and speculative statements). Given the inherent "difficult[ies] in proceeding *pro se*," *Silberman*, 927 F.3d at 1132, we'll grant Rivera *one final* opportunity to amend his complaint as to Count I *only*. This means that Rivera cannot amend Counts II and III and may not add any new counts to Count I. If Rivera fails to fix the deficiencies we've discussed in this Order (or otherwise cannot state a claim), we will dismiss his Third Amended Complaint *with prejudice*.

## CONCLUSION

After careful review, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Dismiss the Second Amended Complaint [ECF No. 53] is **GRANTED**.

2. Counts II and III of the Second Amended Complaint are **DISMISSED** *with prejudice*.

3. Count I of the Second Amended Complaint is **DISMISSED** *without prejudice*.

4. By **December 4, 2024**, Rivera shall file his Third Amended Complaint. The Third Amended Complaint shall be limited to Rivera's equal-protection claim against the Defendants.

**DONE AND ORDERED** in the Southern District of Florida on November 4, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record
        Rico Rivera, *pro se*